Call H.U. v. Northampton Area School District Call H.U. v. Northampton Area School District Please. Your Honor, good morning. Michael Schaefer from Schaefer and Geyer for the appellant. I'd like to reserve three minutes for rebuttal, please. Okay, that's about it. Since this is a motion for a summary judgment, I feel obligated to just point out some of the facts of the case, but there are some very important facts. Before we get to that, you have sued Northampton Area School District and the I.U. 20. You have not sued any individuals. Correct. So you are in Monell land. Correct. Well, to be clear, Northampton has been let out of the case. Okay, that's right. But I'm talking in terms of who you have sued. Yes, Your Honor. So you're in Monell. Yes, Your Honor. And you have to show a custom or policy, and you've alleged in your complaint failure to train and failure to supervise. I also – I'm sorry, go ahead. And you also allege that the bus aid, a lot of things having to do with the bus aid. But your main allegation against the I.U. is that the policy makers deliberately chose not to train, not to supervise. Under the cases you rely on, Connick and City of Canton, don't there have to be acquiescence in a pattern of constitutional violations before an instance such as this can arise to the level of a constitutional – unconstitutional policy or custom? Well, I think there is, Your Honor, to some degree where there is no bright line as to whether or not – what constitutes the first violation. In other words – What other violations do we have here that should have put them on notice that they had an obligation to train and to supervise? Okay. The defendant, the head of busing, admitted that this student population was at risk for this exact type of conduct. He admitted that this type – But had that type of conduct actually occurred to put them on notice? This type of – the transportation supervisor, Mr. Aul, A-U-L, testified that peer-to-peer, because this was a special needs population and this type of population of students did not have impulse control, that in their experience that there would be sexual harassment and peer-to-peer sexual assaults would occur on the buses. But is that prediction or that potential enough? These cases say there have to have been – they have to be aware of other unconstitutional violations in order to put them on notice such that this would then be an unconstitutional customer policy. And I'm just saying what the cases that you rely on, City of Canton and Connick, what they say. Well, that – exactly, Your Honor. That – with regard – it's – there is no bright-line test with regard to this particular analysis. Here we have notice with regard to the population. And for this particular child – – testimony from Kevin Aul, but in that same – that very same passage in the transcript that I assume you rely on where he says the question is put to him in deposition, do you have – are you aware of this possibility? He says, yes. Later the question is asked, has it happened at Colonial that children with special needs have had inappropriate sexual contact with each other on Colonial buses in the past? And his answer is, not that I am aware of. The other – Isn't there a – aren't we just within the very same deposition, the very same discussion that you're relying on, have contrary evidence that creates a factual issue, a material issue of fact about whether they're on notice or not? Well, exactly, Your Honor. It doesn't – for a summary judgment stage, don't the – don't those factual inferences go to the plaintiff, the non-moving party? Yeah. So if you say, hmm, there you go, there's a question of fact about whether they were on notice, then that raises a different question in my mind, which is whose knowledge, right? So let's assume Kevin Aul knew that there was a material issue of fact about what he knew. What does that say at all about what the bus driver or the bus monitor? Well, that – I think that leads us to the second part of my theory, and that's a state-created danger, Your Honor. That's – I have two – I allege a policy, but I also allege a state-created danger because the aide put the two children next to each other. And so there's no dispute that they – that knowledge of the assailant, A.J., was a ticking time bomb. But doesn't the actor, the person who is affirmatively acting, they have to act with deliberate indifference? And the bus aide could not have acted with deliberate indifference because the kids had been fine on the bus before, they'd sat next to each other before, no instances. How was she acting with deliberate indifference? I think, Your Honor, that the cases – so the question seems to be, Your Honor, is when we talk about is it deliberate indifference upon the state actor, the defendant, or a state actor? So here we have a – and the court's going to have to – we have to – in the society we're living in, we're going to have to make a decision. You're going to have to make a decision. Well, then let's give you the benefit of the doubt and say it is the school administrators with deliberate indifference. It sounds like you're saying that given the fact that this school is for children with issues who act out, that it's going to be deliberately indifferent if any of these kids gets on the bus because they could do something. Well, no, Your Honor. I'm saying that they should tell the bus drivers and the bus monitors that they – Well, they have been trained – Not to – – to attack, too. They were trained on general taking care of these kinds of kids. Not for peer-to-peer conduct. Under the district court's analysis, AJ, this child, had threatened to blow up the school. Yeah, we're with you. We read the stuff. So assume – under the district court's analysis, assume AJ blew up the school bus and stabbed the kids on the bus. Under the district court's analysis, because the school aide or the bus monitor, because the supervisors did not tell the bus aide, the school would be immune from suit. Is that really – in the society that we're living in, are we – we have to make – this court has to make a decision. In the society we're living in, we have schools with these kinds of students. Are we saying that we shouldn't give them bus transportation because there's a possibility that they're going to do something? No, we're saying we should tell the bus drivers – What's the bus driver to do? Be trained, be aware. I have a bussing expert that gave an expert report. This bus driver, the monitor never turned around, never monitored them, never looked around, never did anything, wasn't aware of what was going on. So if I presented the case to the jury, what I would present to the jury was that the school administrators should have told the bus monitors and the bus driver that they had a dangerous – Now you're saying they should have told, right? Correct. So we're back to knowledge. First, though, let me ask you just a straight legal question. Can your failure to train claim survive if your state-created danger claim doesn't? I believe it can, Your Honor. And how can that be? Because don't you have to have a constitutional violation in order for your failure to train claim to survive? Well, I think if we said there's no state-created danger, then you don't have a constitutional violation, do you? Well, I think the failure to train, the court would have to analyze and determine if the defendant was on notice as to these children's propensities for violence and if the director had knowledge and they should have trained and whether or not that – I'm trying to get you to answer a real specific point. Sorry. It's not a trick question. Maybe I'm not following. Would you agree that in order for there to be a failure to train claim, there has to be an underlying constitutional violation? Yes. You can't fault somebody for not training if there's no thing that happened that was against the Constitution? Yes. Okay. And do you have some other constitutional claim besides the state-created danger claim? I believe that the failure – the stronger claim, frankly, is the state-created danger, but – It's not just the stronger one. I mean, I'm trying to figure out if it's even possible for your failure to train claim to exist in the absence of the constitutional violation that you assert exists because of the state-created danger. I believe – Do you understand what I'm trying to get at? I do. Okay. And if that arc of reasoning that, you know, you have to have a constitutional violation and the constitutional violation you've alleged is a state-created danger is accurate, then without the state-created danger claim, you don't have a failure to train claim, do you? Correct. Okay. So with that in mind, let's focus on state-created danger. The state-created danger claim requires the knowledge that you're talking about. And you've argued in your supplemental memo, and you're arguing here, that we must be able to impute. How do we – they should have told, you said. They should have told these people. There's the Family and Education Privacy Act, the FERPA Act. There's HIPAA. There's privacy rules under the IDEA. Are you asking us to set up an impossible circumstance for school administrators where they – you're saying you need to tell people about this young man at the same time that there are statutory rights and responsibilities that say you're not free just to start talking about medical history and other things, psychological exam results, et cetera, to just anybody out in the school employee population? I think that's a great question, Your Honor, and I thought about that. Thank you. Because it's a balancing test. I mean, do we want to live – I mean, you're – because here, the way the district court's analysis is, all the state – it is a carte blanche immunity. All the state actors have to say is, I missed the memo. I didn't see it. I didn't know. And the defendant will have automatic immunity. Automatic – Can I ask a real specific thing, though? Does it matter that there – should it matter when we're asking – you're asking us to say they should have told? Does that apply to everybody? Should they tell everybody in the school? Well, assume for a second that A.J. took K.U. to the back of the cafeteria and did the same abhorrent things to that young woman there that he said to have done to her on the bus. Would you say there's a state-created danger because they didn't tell the cafeteria workers? I think there's an obligation on behalf of the school to protect the children. Okay. And if they do something – But I've asked a specific hypothetical. Yes. Give me an answer. Yes. Would they have caused a state-created danger because they didn't go down to the cafeteria and say to what we used to say disparagingly, voluntarily, but to any cafeteria worker, say, listen, I know you're making sloppy jokes here, but A.J. is a dangerous character, et cetera, et cetera, et cetera. Well, I mean – Would that be state-created danger? I mean, I have kids who are seniors now, so I know that there are aides in the cafeteria who are watch out, who monitor the cafeteria. I know that's what they do. And they watch out for kids that they know are trouble. I mean, this is not a – this is not violating HIPAA. This is not violating confidentiality. You're trying to raise their duty to the level of a constitutional violation, though. Well, I know that they're not going to – You have to be mindful that it really is the law of the constitutional violation that we're talking about here. But if they're going to do something to put these kids in danger, which is what I allege and what happened here, there was an affirmative act by putting these two children together, and that was the danger. I mean, isn't the better – in the news last night, I just saw that there was a shooting in Virginia. It was the sixth story in the news, for crying out loud. I mean, where are we going to be here? Are we better to warn kids and to warn our students to make them safe, or are we going to shield liability when we know there's a danger? So H.U. asked to sit next to A.J. She asked to, and then they did for several days without any incident. Does that break the chain of causation? Or if they had sat for three weeks together or three months together, at some point, doesn't it break the chain of causation? Well, for here it was two days, I believe, two or three days. And I think that the difficult thing is that they should have known. Had they known that – of A.J.'s propensities for this violence – Propensities for what violence? Well – For sexual misconduct? Is that in the record? I think that – and even the district court recognized that this was a violent act. This had nothing to do with sex, even though it was a sexual act. This was a violent act. This was a violent act upon a child. Yes, it was a sexual act, but it was a violent act. It could have been an assault. It was just done in a different manner. All right. We'll have you back on rebuttal. Thanks very much, Mr. Schaffer. I have to gear up here. A second for my glasses to clear. Okay. Go ahead. Have a seat. Yes, please. My name is John Froyen. I represent the Colonial Intermediate Unit. Can you hear me? Yes. The Colonial Intermediate Unit. Your Honors, I think that the one overarching aspect to this whole case, and particularly Mr. Schaffer's argument, was kind of hit on by Judge Rendell, and that is the Colonial Intermediate Unit is in the business of educating and serving troubled kids. We understand that, but you should speak directly to the assertion that Mr. Schaffer's making, which is, as I take it, all the more reason for you to be taking precautions. You have a troubled population. Some of them have major issues. And so it's an enormous problem to put a child with known violent tendencies on a school van, in a school van, and not let the monitor, who's supposed to be there paying attention, know this kid's got real problems. Keep an eye on him especially. I take that to be the gravamen of their assertion. But it was incumbent on the Colonial to do that. It failed to do that, and as a result, a terrible assault took place. Or as alleged to have taken place. There's still the jury is out on it. Understood. We're here reviewing summary judgment. That's why I hit it with Mr. Schaffer right at the outset. You could say at a minimum, oh, there's issues of fact here that need to be dealt with, if you could impute knowledge. So the question is, can you impute knowledge? Was there an obligation to share knowledge? A couple things. First of all, as I said, practically all of these kids have conduct problems. I guess you're looking at the particular kind of conduct problems. And, you know, in that regard, I would contrast the Billingsley case that's cited in the briefs. And in the Billingsley case, we had a situation where a girl was allowed to have the hall pass, and then a boy was allowed to have a hall pass, and there was a rape and so forth. However, in that case, and again, that case was on a 12-by-6, not on a summary judgment, I think. Plaintiff alleged, I'm reading from the case itself, Plaintiff alleges further that the individual defendants were also aware that J.R. had aggressive tendencies and repeatedly made sexual advances to female students, which behavior was flagrant. Does the sexual nature of the assault have legal salience? Absolutely. So if they knew that A.J. was, like, Hannibal Lecter-level dangerous and should have been in a straitjacket with a mask on. That's the image I have in my mind, Your Honor. If they knew that, and they didn't tell anybody, and the assault was sexual, what you're saying is, well, we knew he had a tendency to bite people, but we had no idea he was going to grope this girl. That's a legally significant crime. Your Honor, if that were the case, if that were the facts, what should have happened, and it didn't in this case because those aren't the facts, what should have happened is that there should have been in his IEP or some other direction that he would have special either monitoring, an aid, or some kind of accommodation that would direct. Sure. And this didn't happen here. Right. But what I hear Mr. Schaefer's argument to be is, yeah, exactly, precisely, Mr. Foyne, that you should, you, your client, obviously, should have recognized that a young man who's threatening people, who can't be trusted with sharp objects because he might stab somebody, who has actually punched a teacher and a fellow student, who's acted out violently and done so recently, that this is a violent person. And the fact that somebody didn't think to put it in an IEP is a fault of colonial. It doesn't excuse colonial that it wasn't, and it's actually an added signal that they were doing their job. That's what I hear him saying. So that's why I'm asking the question, does the kind of assault really matter? Does the fact that it's a groping and other things mean, oh, well, yeah, we knew he was violent, but we didn't know he was sexually violent. I mean, does that matter, the kind of violence? I think it absolutely matters, Your Honor, because one of the requirements of the State Created Danger Act, or liability in any case, is predictability and foreseeability. And if you have a history, like A.J. did, of defiance of authority, confrontation with peers, no history, by the way, whatsoever, and I went through the entire record, and I think the Court has as part of this record, there's no history of any misbehavior on the bus. No history of misbehavior sexually either, right? No, none whatsoever. Had there been, had there been, had there been the facts that there are in Billingsley, then there should have been something to address that. That's not the case here. That record, the record is completely devoid of any suggestion that there would be an unprovoked, unexpected sexual encounter with this girl. And I think Your Honor also mentioned that, you know, they don't hand these records out freely. And the other thing is that, you know, I think that depending on the kind of violence you're talking about, and again, all these kids have problems. So, you know, where do you, and I'm sure that many of them are involved in what you might call violence resistance to teachers and so forth. Yeah, that's common. That's why they're there. That's why they are in this school. So unless you distinguish the sexual aspect that is alleged to have happened here from what was happening in his record, which was basically, you know, resistance to authority, confrontations with peers. I don't know how you can leap from that record to what's alleged to have happened here, which is undeniably a sexual encounter. I don't know how you can say it's just a physical assault. It's a sexual encounter. Yeah, it's an assault. And that's their assertion, that sexual assault is a subset of assault, and AJ was known to assault people. And the fact that he, in the past, he had assaulted people in this specific way doesn't mean he wasn't known to assault people, because he was known to assault people. So you can't escape liability by saying, yeah, yeah, but it was never that kind of assault. It was assault, but it wasn't that kind of assault. I hear them making that argument. But let me shift the question slightly and ask you about the bright factors, because in your supplemental memo, you argued the third and fourth points. You argued that there was no special relationship and that there was no affirmative act. But that wasn't any argument that was made in the briefing. So having failed to make that in your answering brief, have you effectively waived those points? What, waived the special relationship? Yeah, yeah. When I took a look at the briefing, and maybe I missed it, I didn't see that argued in the answering brief. The answering brief went after the knowledge piece and went after it aggressively, and we've been talking about this here. So I was a little surprised in your supplemental memo to see you taking on the third and fourth bright factors when I hadn't really noted that before. If I recall, Your Honor, I don't think that Judge Wilson even delved into that. I mean, the law is so clear here from LRDR, which is a case I was involved in way back in the early 1990s. It's been clear that students, or rather school districts, do not bear a special relationship to students. They're not prisoners. And that's what this court identified a long time ago. So I don't even recall the judge dealing with that. And, yes, it is true. We focused on what we understood was Judge Wilson's really primary reason for granting summary judgment, which was that second element of deliberate indifference. Yeah, and you've argued no affirmative act, too, for the first time in your supplemental brief. But isn't seating KU next to AJ an affirmative act? I'm sorry, Your Honor. Isn't that seating KU next to AJ an affirmative act? She may have asked for leave to do that, but she could not have done it without them saying go. I will grant that it is probably enough to squeak by on that issue, but just barely. All right. Well, on the broad question, the very broad question that Mr. Schaffer has raised, which is if you don't allow some imputation of knowledge here, then you allow school districts to insulate themselves from obviously bad behavior with obviously terrible results. And so there has to be some kind of imputation. Otherwise, there's no societal accountability. You give a pass to a bus or a van monitor who sits at the front and chats up the bus driver and never looks back to see the students. You just allow that to happen, and any terrible thing can go on. And then the school district can come in and say, well, they didn't know. We didn't tell them. In fact, I guess the argument could be made it actually creates a perverse incentive by holding knowledge back that should be shared and would be shared, because then you can say, yeah, they didn't know because nobody told them. That's the argument being made from the podium here today with some not inappropriate passion. He's here for his client. What's your response? Well, in general, Your Honor, I can't disagree with the points you made, but it's all context. Once again, if the record in this case showed that a J had a propensity for sexual assault, even a propensity towards violence, towards toward females, or that he had a history of disruptive or inappropriate behavior on the bus, which caused an issue. Then perhaps those things should have brought and been brought to the attention of the bus driver and so forth, should have been in his IEP. But the fact of it is that the facts don't support that. Now, in a way, Mr. Schaeffer is kind of making an argument, which is kind of a disappointing argument, which is, you know, we have a population of disabled kids that all have conduct problems. Therefore, we should have basically put them in all the little handball electromasks to protect everybody from any possible thing that could possibly happen, because their record shows that they have a propensity towards violence. And I submit that just is not a viable argument. Yeah, that would be true. But what about the argument that you ought to at least have a bus monitor or a van monitor who's paying attention and is tuned in to the fact that... Let's ask the question this way. Assume that Ms. Young were the only person who didn't know that in the colonial school, the SIU, that the problems that AJ had were widely understood and known. They'd been talked about. Everybody knew it except Ms. Young. Would you still say no state created danger? I would, Your Honor. But she didn't know. She didn't know. Everybody else had been told, but somehow she didn't get the memo. Well, and there's two things. Number one, what you're describing sounds more like a negligence case to me than anything else. And, again, as Judge Rendell pointed out, we have a Minnell case here. We don't have any individual liability. The only thing that was pled here in the complaint was state created danger. It didn't plead anything else. No, they pled failure to train, failure to supervise. And, by the way, can you have state created danger claim against an entity rather than against individuals who purportedly had knowledge and acted? I've never seen a state created danger claim pled against a government entity alone. Against an entity alone. Because if it's against an entity alone, it has to be a customer policy. Yes. We don't make entities liable for the acts of their servants. They have to have had a customer policy. Unless you have a Minnell connection, right. Right. Yeah, you pointed that out, Your Honor, yes. Absolutely. So, you know, again, I go back to the facts in this case. And, by the way, with regard to the point that Mr. Schaefer tried to make in the record, claims that she wasn't looking and so forth, I take a challenge that point. Look at the record. The testimony from the monitor was very, very clear that. And remember, this is not a big bus. This is a nine-passenger tiny bus. I mean, this was literally the short bus. All the more reason she should turn around and make sure he's not blowing up the bus. If she had turned around to make sure he wasn't blowing up the bus, he would have seen what he was doing. But that's not what's in the record. That's not what's in the record. She said she was so close. She was so close, she could not only hear, but she could actually feel when they moved. I mean, this was a small area. I mean, it really, in terms of. . . There you're into. . . I'm not sure that's your best territory, Mr. Foy, because if what she's claiming is, you know, sort of a Star Wars thing, I don't have to look because I can feel it. I know what they're doing back there. That doesn't really help too much. But more to the point, it gets into factual disputes, and you're in. . . Right, right. You might. . . But I'll say this. I don't think that that's what the testimony was in the record, and there's no testimony to contradict that. Okay, okay. Well, any other questions, Judge Porn? Okay. Let me just sum up by saying that I think, you know, Judge Walson granted this motion based on that second prong of the Bright Test, but I think that he could have dismissed this on any of the four because it's simply not there. Had this been Billingsley, we might not be here. Okay. Thank you very much. We'll have Mr. Schieffer back for rebuttal. Mr. Schieffer, can I start where I started before, and that is you've sued the IU. Yes. Can there be a state-created danger claim against the IU, or didn't you have to plead against individuals? I don't believe so because I think the cases hold them responsible for the actions of their. . . No, no, that's the whole point. They do not. The cases say that the entity, the government entity, has to have had a customer policy because there is not respondeat superior here. I understand that, Your Honor, but I believe that because the way that the facts, the way the facts played out, that I didn't know who the person, who moved the person at the time that the complaint was filed. But wouldn't you amend to add all of the people who you say had knowledge and failed in this situation? I mean, I don't know how you get a state-created danger claim against an agency without customer policy. Okay. I guess my point is that I believe that I did because the defendants acted to create the. . . I allege in the complaint that they acted through their agencies. But it's just one. . . the only defendant is the IU. Correct. Let me ask you about Deshaney against Winnebago County. In that case, the county gave custody of Will Joshua to his father, even though they didn't have imputed knowledge. They knew. They knew for years about the father's problems, and they still put Joshua into his custody. That wasn't actionable. That wasn't a state-created danger, even though it was foreseeable and so on. Why? How do you distinguish that? That's because there was no state action, I believe, in that case. In other words, there was no particular. . . In that case, as I understand that case, they didn't do anything to change the status quo, as I understand the facts of that case. And here, by changing the seats, they changed the status quo. I think they changed the status quo when they gave custody to the father instead of to the mother. Because they don't have an obligation, as I understand the case. . . As I understand it, there was no affirmative act, so the fourth prong wasn't met. Perhaps you could just deal with the question of attribution of knowledge again for a moment. Sure. We say there's no. . . that you can't attribute deliberate indifference.  Or maybe another way to think of it is this. We don't allow vicarious liability to respond to a superior liability in a Manel claim. But isn't your effort here very akin to that, just in reverse? You're saying that the employees are responsible because of what the supervisors or the people who had information knew. That that knowledge has to go to them, therefore they're responsible. It seems to be that the case is that it really turns on. . . It's the. . . whether or not it's the state actor or a state actor. And when we talk about the state actor, and the state actor is the Colonial IU, and the state actor are all the people. . . Just like you mentioned, if all the administrators, all the people, all the individuals had a knowledge, and if a state actor didn't have knowledge, it would really give them a shield to liability. Okay. And that's really what we're talking about. Gotcha. Thank you. All right. Thank you very much, Mr. Schaefer. Thank you, Mr. Coyne. We've got the case under advisement.